**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Janice WESTON, a/k/a Janice Wallace,**
**Defendant-Appellant.**

**No. 26850.**

United States Court of Appeals,
Ninth Circuit.

Sept. 3, 1971.

---

Michael Garvey (argued), of Houger, Garvey & Schubert, Seattle, Wash., for defendant-appellant.

Charles Pinnell, Asst. U. S. Atty. (argued), Stan Pitkin, U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before DUNIWAY and CARTER, Circuit Judges, and GRAY, District Judge *.

DUNIWAY, Circuit Judge:

Weston, also known as Wallace, appeals from her conviction by a jury of violating 21 U.S.C. § 174, receiving, concealing and facilitating the transportation of 537.11 grams of heroin, knowing that it had been imported contrary to law. She presents two questions, which we discuss separately.

1. *Sufficiency of the evidence.*

Weston argues that the evidence is insufficient to show that she knowingly possessed the heroin. On this aspect of the matter, the government's case rests on the testimony of narcotics agent Wilson, which is as follows: On June 9, 1970, he and agent Higdon were in a car in the Kent, Washington area, looking for Weston. At about 10:30 A.M. he saw her in a Volkswagen sedan, in which she was a passenger. The driver was Brenda Jackson. Wilson made a radio call to other agents, and then he and Higdon followed the Volkswagen. At one point, Weston turned around and looked for a time at the agents' car. It was unmarked, and the agents were dressed in casual clothes. On a residential street, two vehicles carrying other agents pulled out onto the street ahead of the Volkswagen, partially blocking the street. These vehicles were also unmarked, and the agents in them were similarly dressed. Jackson slammed on the brakes and turned down a road—a private driveway. As the Volkswagen approached a house, it slowed, and Weston jumped out. She lost her balance and fell. Either just before or while she was falling, she threw away a paper sack,

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

which went over the top of the Volkswagen and landed on the other side of it. The sack contained the heroin. On rebuttal, agent Higdon corroborated agent Wilson's statement that Weston threw the sack over the car. Wilson testified that Weston later told him that the price of heroin in Mexico was $300 an ounce.

Weston took the stand. Her story was that Jackson had offered to drive her to the airport, that the paper sack was on the front seat when she got into the car and that she put it in her lap, along with her purse, because that was the easiest thing to do. She had no idea what was in the sack. When the agent followed them and blocked the way, the two women feared a robbery. As they approached the residence, Jackson told Weston to run to the house and call the police. When she jumped from the car, she lost her balance and the sack and her purse went one way and she went another. She did not throw the sack.

Had the jury believed Weston, no doubt it would have acquitted her. Evidently, however, it chose to believe the agents, and their testimony supports an inference of guilty knowledge on Weston's part. The evidence is sufficient.

### 2. *The sentence.*

After the verdict was received, the court indicated that it felt that the minimum mandatory sentence, five years, would be appropriate. Government counsel demurred and asked that a presentence report be obtained. Before sentencing, the report was read by Weston's retained counsel.

The most damaging information contained in it is the following:

"This officer interviewed Narcotic Agents of the Federal Bureau of Narcotics and Dangerous Drugs who have been investigating Mrs. Wallace's involvement in narcotics since about February of this year. They advised that in their opinion Mrs. Wallace is a very intelligent and clever dealer in heroin. They feel that she has never used the drug but has been the chief supplier to the Western Washington area.

"According to their investigation Mrs. Wallace traveled to Mexico or Arizona periodically to obtain approximately $60,000.00 worth of heroin. She then would distribute the drug to various dealers in Western Washington earning approximately $140,000.00 profit on the $60,000.00 investment. Narcotic agents felt that she might have made such trips as frequently as every two weeks. They feel fortunate in obtaining sufficient evidence to bring Mrs. Wallace to court.

"Narcotic agents advised that four of Mrs. Wallace's distributors have been apprehended and two have already been sentenced. These four are Jane Ann Meisner, Docket 51969 and 51996, sentenced to 10 years imprisonment, Stanley Gene Hunter, Docket 51966, sentenced to 10 years imprisonment, Carl Lee Brewer, Docket 52025, case pending, and Arvis Marie Banks, Docket 52024, case pending.

"*Defendant's Version:* Mrs. Wallace refused to participate in the presentence investigation. She did explain that she feels bitter and dissatisfied with the jury verdict of guilty in the current offense and with the Prosecuting Attorney's refusal to allow her to plea [sic] to a lesser offense. Due to her unwillingness to discuss herself, the offense and other pertinent background information, this report is limited in scope.

"Mrs. Wallace states that she sees no reason to submit to a presentence study since there is no possibility of probation and she fails to see how a presentence report might help her. At this point her attitude toward the offense is one of denial with regard to her extensive involvement in drug sales."

The report also shows a series of 9 vagrancy and shoplifting charges against Weston, in Spokane, Portland, Seattle, Renton, Pasco and Tacoma, between 1963 and 1969. The first and last were mark-

ed "no disposition," or "stricken." She was convicted once in Portland in 1964, fined $75.00 and sentenced to 90 days suspended, and once in Tacoma in 1969 and fined $150. In each other case she forfeited bail—$100. That is substantially all that the report contains.

At the sentencing hearing, the court asked counsel to comment on the information indicating that Weston was a large-scale heroin dealer. Counsel replied that "she says it's just not true," that making $140,000 profit every two weeks was beyond counsel's imagination, and that he had never seen Weston display any sign of wealth. Weston also commented on the report:

"THE DEFENDANT: Yes. He called and asked, was asking questions, and I told him that this wasn't true. And the things that they had said wasn't true. And nothing else I could possibly say could ever, nothing I could say would do me any good. And this is not true. And if it is true, how could you bring facts, because it's not true, how could you say these are facts?"

The court then summarized its views:

"Well, as I commented, Mr. Kempton, in the companion case, the Jackson case, this Court has great respect for the probation service in this and other districts, and I believe as a whole they are a group of officers who are extremely objective, very concerned with the welfare of the defendants, who they report upon, and also are attentive to their duties as officers of the Court.

"And when statements are made categorically as they are made here, the Court has no alternative, in the face of contrary factual information, rather than simply a vehement denial, but to accept as true the information furnished the Court which in turn was obtained by the probation officer from the officers of the Federal Bureau of Narcotics and Dangerous Drugs.

"However, officers can be in error; mistakes can be made. * * *

* * * * * *

"So I'm going to advise you, I'm sure you're already aware of it, that Rule 35 of the Federal Rules of Criminal Procedure provides that within 120 days after imposition of sentence the Court may reduce or otherwise modify the sentence imposed. And I invite you to conduct your own investigation, and if you feel that you can obtain facts that contradict the factual statements that are so damaging here to this defendant, and to her co-defendant to a lesser degree, the Court will welcome the submission to it, and it can be done by mail on a motion for modification if you file the same timely.

"Of course, the Government will have an opportunity to respond, and the Court will then decide upon the moving and responding papers whether or not to modify the sentence that's imposed in these two cases. * * *

* * * "

The colloquy then continued:

"MR. KEMPTON: Yes, your Honor. Under Rule 35, which affords me an opportunity to approach the Court with a motion for reduction of sentence, we have—let's say we have one narcotics agent on the streets that tells Mr. *Levy* of the Probation Department, 'We think she's the biggest dealer in the Western states,' I can't conceive of what type of investigation I can do to come back and say that she isn't.

"THE COURT: Well, I can't do any more than I've done to point out this remedy to you. I recognize that the problem could be a difficult one. But I think you can appreciate the Court's position: to choose between a flat denial of the defendant and a factual matter reliably represented to the Court by the Bureau of Narcotics and Dangerous Drugs through the probation officer, who tacitly, at least indicates, that this information is correct.

"Very well.

"Mrs. Weston, again, do you have anything further to say before sentence is pronounced?

"THE DEFENDANT: This is not true. And I have no way—if they have any way of proving this is true, why don't they bring the evidence that this is true, that I was going out of town and doing all of this stuff? They can not have any evidence of it because this is not true. This is what they 'hearsay'.

"Now, nothing has been brought up to establish the fact that I did this. All they're saying is what the agents said or what somebody told them. I know this isn't true, and I'm quite sure they can't establish the fact that it is true."

The court then imposed the maximum sentence, 20 years, and continued:

"Now, in addition to what I've said, that Rule 35 affords counsel an opportunity to move for reduction of sentence, I'm going to direct the United States to do something I've never directed before. I'm going to direct them to submit to me in camera factual material that support the conclusions set forth in the report. I can well understand that the Bureau of Narcotics and Dangerous Drugs would be reluctant to reveal the sources of their information. But in view of the severity of the sentence just imposed on Mrs. Weston, which I think is a proper sentence if these be the facts, I want to have a second look at it. So if you will obtain that information in due course and submit it to me in camera, it can be contained in a sealed envelope and mailed to me. * * *

* * * * * *

"I will go over the matter carefully, and on my own motion, if I'm satisfied there's some doubt, if I determine that there's a reasonable doubt that these statements made are factual, have a factual basis, I will on my own motion modify the sentence within the time prescribed."

On November 2, 1970, the court filed an order reciting the material about Weston's dealing in narcotics that we have quoted from the pre-sentence report, stating that a report prepared by the Bureau of Narcotics and Dangerous Drugs had been submitted to the court in camera, and that "the conclusions * * * of the pre-sentence report * * are supported by the facts detailed in the confidential report. The Court is satisfied that it imposed the appropriate sentence. * * *"

The confidential report has been forwarded to us under seal. It is an unsworn memorandum from agent Wilson to his superior. It does little to corroborate the charge in the probation report. Instead of showing, as that report indicates, that Weston made trips "periodically" to Mexico, "as frequently as every two weeks," it quotes a named informant, described only as "previously identified as a reliable cooperating individual," who indicates that on one occasion such a trip was about to be made, not even that it was in fact made. It does use the $300 an ounce figure for the Mexican price, and $1000 as the resale price.

The report next details the events leading to this case, and a later search of Jackson's house, where 2 ounces of heroin and 2 ounces of cocaine were found, in packages identical to those seized in this case. The report finally quotes the informer as saying that Weston was distributing quantities of heroin to Jackson for delivery to select customers.

That is all there is. To say that it corroborates the very broad charges contained in the pre-sentence report is an over-statement. Moreover, it contains nothing to show, rather than to assert, that the informant was reliable, or otherwise to verify the very serious charge made against Weston. It appears in the record in this case that Weston's house was searched after her arrest and nothing was found, nor was any narcotic found on her person or in her purse.

In essence, then, what we have is a conviction at a trial providing all of the safeguards required by the Constitution,

of an offense warranting, in the opinion of the trial judge, the minimum sentence of five years. This is followed by a determination, based on unsworn evidence detailing otherwise unverified statements of a faceless informer that would not even support a search warrant or an arrest, and without any of the constitutional safeguards, that Weston is probably guilty of additional and far more serious crimes, for which she is then given an additional sentence of fifteen years. *Cf.* Specht v. Patterson, 1967, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326; Kent v. United States, 1966, 383 U.S. 541, 553–554, 86 S.Ct. 1045, 16 L.Ed.2d 84. To us, there is something radically wrong with a system of justice that can produce such a result. The problem is, what, if anything, can be done about it.

It has long been the rule in this circuit that this court "has no authority to review the sentence so long as it falls within the statutory limits." Bowman v. United States, 9 Cir., 1965, 350 F.2d 913, 917, and cases there cited; United States v. James, 9 Cir., 1971, 443 F.2d 348 and cases there cited.

Moreover, in Williams v. New York, 1949, 337 U.S. 241, 69 S.Ct. 1079, 93 L. Ed. 1337, the Supreme Court held that due process does not require that information relied upon in sentencing must be "restricted to that given in open court by witnesses subject to cross-examination," 337 U.S. at 250, 69 S.Ct. at 1084. The Court stated:

"The due-process clause should not be treated as a device for freezing the evidential * * * procedure. So to treat the due-process clause would hinder if not preclude all courts—state and federal—from making progressive efforts to improve the administration of criminal justice." 337 U.S. at 251, 69 S.Ct. at 1085.

*Williams* involved the most serious penalty of all, death. There the appellant was convicted in a state court of first-degree murder. The jury recommended life imprisonment; the trial judge imposed sentence of death. In imposing the sentence, the trial judge relied, in part, on hearsay statements contained in a presentence investigation report and charging Williams with the commission of thirty burglaries for which he had not been convicted. *Williams* is still good law. See the discussion of its status in McGautha v. California, 1971, 402 U.S. 183, at 217 and footnote 22 (plurality opinion of Mr. Justice Harlan) and at 225 (dissenting opinion of Mr. Justice Douglas).

The government argues, in substance, that the rule against review of sentences, taken together with the rule in *Williams*, require affirmance of the sentence here.

Weston's case, however, is different from *Williams*. She vigorously denied the accuracy of the charges and objected to the judge's consideration of them without more substantiation of them than appeared in the probation report. Williams apparently did neither. See Williams v. New York, *supra*, 337 U.S. at 244, 69 S.Ct. 1079. Williams had admitted a number of the burglaries. Furthermore, Williams' constitutional attack was much broader. He challenged the use of any hearsay information whatsoever in sentencing unless a trial-type hearing were held complete with due process safeguards and standard rules of evidence. In short, he urged that sentencing should be turned into a second trial. This the Supreme Court declined to do. Weston's case does not present that issue.

There is a difference between reviewing a sentence and deciding that certain types of information should not, for various reasons, be considered in sentencing. In the latter type of case, the appellate courts have not undertaken to modify the sentence. Instead, they have vacated the sentence and remanded for resentencing, instructing the trial court to disregard the objectionable information. We give a few examples, but with the caveat that we are not committing ourselves to follow the example of other courts in every instance that we cite.

First, we have held that where the trial judge, in sentencing, relies upon ev-

idence obtained in violation of constitutional rights, the sentence will be vacated and the case remanded for resentencing without considering the evidence so obtained. Verdugo v. United States, 9 Cir., 1968, 402 F.2d 599, 610–613; c.f. Armpriester v. United States, 4 Cir., 1958, 256 F.2d 294, 297. In *Armpriester*, the use of such evidence at sentencing was held not prejudicial. United States v. Schipani, 2 Cir., 1970, 435 F.2d 26 is *contra*. *Schipani* distinguishes *Verdugo* on the ground that in *Verdugo* the evidence was illegally seized for the purpose of enhancing the sentence. That, however, is not what *Verdugo* held. The evidence used to enhance the sentence in *Verdugo* was not seized for that purpose; we merely referred to such a possibility as a reason for requiring that no evidence unlawfully seized be considered at sentencing. It can hardly be said in the present case that the use of the "evidence" that Weston was "the chief supplier [of heroin] to the Western Washington area" was harmless. It cost her 15 years. We do not mean that such "evidence" was illegally obtained; we deal here with analogy only.

Second, other courts have held that where a trial judge, in exercising his sentencing discretion, imposes a greater punishment because the defendant chose to be tried by a jury rather than plead guilty, or because the defendant, after a jury trial, refuses to admit his guilt and repent, the sentence will be vacated and the case remanded for resentencing. This is on the theory that, to the extent that the defendant's assertion of Fifth and Sixth Amendment rights forms the basis for a harsher sentence, the exercise of those rights is made more costly. See Scott v. United States, 1969, 135 U.S. App.D.C. 377, 419 F.2d 264; Thomas v. United States, 5 Cir., 1966, 368 F.2d 941. We have not followed these cases. In Gollaher v. United States, 9 Cir., 1969, 419 F.2d 520, cert. denied 396 U.S. 960, 90 S.Ct. 434, 24 L.Ed.2d 424, the Thomas case is discussed (p. 530). Gollaher does not expressly disapprove or distinguish the *Thomas* case but states that "[t]he trial judge rebuked appellant Gollaher for his failure to confess to the crimes of which he was convicted and took his failure into consideration in setting sentence." (P. 529.) Nevertheless, we held that Gollaher's Fifth Amendment rights were not infringed and the judgment was affirmed. And in Whitfield v. United States, 9 Cir., 1968, 401 F.2d 480, p. 483, cert. denied 393 U.S. 1026, 89 S.Ct. 630, 21 L.Ed.2d 570, we said: " * * * it is not an abuse of discretion for a district judge to deny probation to a person who, after conviction, will not admit wrongdoing." There, however, we pointed out that we were being asked to review a Rule 35 motion made after appeal and affirmance at which time an admission of guilt could have no chilling effect upon the right to appeal. Thus we suggested that the result might be different on direct appeal from a sentence denying probation for failure to confess and repent. We mention *Scott* and *Thomas* here only as examples showing that the "no review of sentence" rule does not preclude reviewing the propriety of the reasons for imposing a particular sentence.

Third, where a trial judge, in exercising his sentencing discretion, relies on evidence of prior convictions that is false, or mistakenly believes that the presentence report shows prior convictions when it does not, the defendant has been deprived of due process and the sentence must be vacated. Townsend v. Burke, 1948, 334 U.S. 736, 740–741, 68 S.Ct. 1252, 92 L.Ed. 1690; United States v. Malcolm, 2 Cir., 1970, 432 F.2d 809; United States ex rel. Jackson v. Myers, 3 Cir., 1967, 374 F.2d 707, 710–712.

Fourth, where there exists a reasonable probability that a trial judge imposed a heavier sentence because of prior uncounseled convictions invalid under Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, this court has ordered that the sentence be vacated and the case be remanded for resentencing without consideration of the invalid prior convictions. See Tucker v. United States, 9 Cir., 1970, 431 F.2d

1292. In *Tucker*, we relied in part on Gilday v. Scafati, 1 Cir., 1970, 428 F.2d 1027, where the court prohibited the use of uncounseled convictions to impeach credibility for the dual reasons that "[t]he absence of counsel impairs the reliability of such convictions" and that "such use compounds the original denial of the constitutional rights." 428 F.2d at 1029. The Supreme Court has granted certiorari in *Tucker*, and it may be, therefore, that the decision will not stand. The fact remains, however, that our decision in *Tucker* is another example of consideration, on appeal, of the reasons or factual basis for the sentence. Thus where it is argued that the trial judge gave weight to an improper factor in imposing a sentence within the statutory limit, appellate courts do have power to scrutinize the reasons for the sentencing decision.

We next turn to the question here, whether it was proper for the trial judge to rely on the information in the presentence report, in the face of Weston's vigorous denial, in fixing her sentence.

■ ■ Two arguments can be made in support of the proposition that the court properly relied upon the report. The first is that Williams v. New York permits it. A number of courts, including this court, have frequently cited *Williams* for the general proposition that evidence of other criminal conduct not resulting in a conviction may be considered in imposing sentence. We have done so a number of times: See United States v. English, 9 Cir., 1970, 421 F.2d 133 (dictum); Austin v. United States, 9 Cir., 1969, 408 F.2d 808; Ward v. California, 9 Cir., 1959, 269 F.2d 906; Tay-

lor v. United States, 9 Cir., 1950, 179 F. 2d 640. None, however, is inconsistent in its actual holding with the result we reach here. Other circuits have done the same. See Jones v. United States, 1962, 113 U.S.App.D.C. 233, 307 F.2d 190; United States v. Doyle, 2 Cir., 1965, 348 F.2d 715, 720–722; United States v. Cifarelli, 2 Cir., 1968, 401 F.2d 512, 514; United States v. Marcello, 5 Cir., 1970, 423 F.2d 993, 1013; United States v. Onesti, 7 Cir., 1969, 411 F.2d 783; United States ex rel Long v. Pate, 7 Cir., 1969, 418 F.2d 1028. We would not repudiate this rule if we could.[1] We do not desire to transform the sentencing process into a second trial, and we believe that other criminal conduct may properly be considered, even though the defendant was never charged with it or convicted of it. Its relevance to the problem before the judge, "what sort of person is this defendant, and what sort of sentence should she receive?" is apparent. But that does not solve our present problem. Here the other criminal conduct charged was very serious, and the factual basis for believing the charge was almost nil. It rested upon only two things: the opinion of unidentified personnel in the Bureau of Narcotics and Dangerous Drugs, and the unsworn statement of one agent that an informer had given him some information lending partial support to the charge.

It can be argued that there were a number of things that Weston might have done to refute the charge beside denying it: (a) The probation report named four persons, two of whom had been convicted and two of whom were charged with narcotics offenses, as Weston's dis-

[1]. There is a trend on the part of some authorities toward excluding this type of information at sentencing.

The Advisory Committee on Sentencing and Review of the American Bar Association has recognized that arrests and other dispositions short of an adjudication can be misleading and would not provide for their inclusion in the presentence report. ABA Project on Standards for Criminal Justice, Probation 37 (approved draft), 1970.

In Baker v. United States, 4 Cir., 1968, 388 F.2d 931, 934, n. 4, the Fourth Circuit, setting down minimum disclosure rules for presentence reports, recently stated that "[n]o conviction or criminal charge should be included in the report, or considered by the court, unless referable to an official record."

We do not go so far.

tributors. This, it is said, provided a fertile field for investigation of probation reports, files, interviewing witnesses, defendants, etc. We note, however, that the report did not state that in any of the four cases there was evidence that any of the named persons was Weston's distributor, or that any of them had admitted it.

(b) The report indicated that Weston had made trips to Mexico as frequently as every two weeks. It is argued that she was in a position to supply information, if true, that she had not traveled, that she had lived continuously in the area, information as to where she was at various times during the preceding several months, etc.

(c) In view of the amount of profit alleged in the transaction, Weston had available to her a showing as to what monies or properties she had, her bank accounts, what type of household furniture and bric a brac; whether she was employed and what her salary was. In this connection it is noted that she had retained counsel and apparently had the money to pay him.

This will not do. It is tantamount to saying that once a defendant has been convicted of offense A, narcotics agents can say to the probation officer, and the probation officer can say to the judge, "We think that she is guilty of much more serious offense B, although all we have to go on is an informer's report," and the judge can then say to the defendant, "You say it isn't so; prove that to me!" In addition to the difficulty of "proving a negative," we think it a great miscarriage of justice to expect Weston or her attorney to assume the burden and expense of proving to the court that she is not the large scale dealer that the anonymous informant says that she is.

In Townsend v. Burke, *supra*, the Supreme Court made it clear that a sentence cannot be predicated on false information. We extend it but little in holding that a sentence cannot be predicated on information of so little value as that here involved. A rational penal system must have some concern for the probable accuracy of the informational inputs in the sentencing process.

■ The conviction is valid, but the sentence must be vacated. On resentencing, the District Court may not rely upon the information contained in the presentence report unless it is amplified by information such as to be persuasive of the validity of the charge there made.

The judgment of conviction is affirmed; the sentence is vacated, and the case is remanded for further proceedings consistent with this opinion.

JAMES M. CARTER, Circuit Judge (concurring and dissenting).

I concur in that portion of the opinion holding that the evidence is sufficient to support the conviction. I dissent from that portion of the decision involving sentencing and the remand for further proceedings.

The majority attempts an end run around Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), permitting a trial judge to consider hearsay information on sentencing, and the cases holding that sentences within statutory limits, will not be reviewed on appeal. The majority disclaims a repudiation of the rule of these cases, but in substance opens up Pandora's box on procedures in the trial court in the use of a presentence report.

The majoriy remands the case for resentencing. I do not understand the majority opinion as prohibiting a new presentence report developing the information in the areas described as (a), (b) and (c) set forth near the end of the majority opinion.

The trial court gave appellant's retained counsel an opportunity to make an investigation and report the results thereof to the court. The areas listed in the opinion were fertile fields for investigation by the defense, but counsel refused to undertake any investigation, or to assist in any way in supplying information within such areas to the court.

The defense counsel made no motion for modification of sentence which could have followed such an investigation. In view of this fact alone, the district judge was justified in rendering the sentence and in allowing it to stand after receipt of the supplemental report.

Moreover the supplemental report was more confirmatory of the matters set forth in the original report than the majority concedes. There was testimony at the trial that appellant told the agent that heroin in Mexico cost $300 per ounce. The supplemental report indicates that the informer stated appellant had paid $300 per ounce for the heroin in Mexico. As the majority states, the supplemental report referred to the search of the house of Jackson, the co-defendant, where 2 ounces of heroin and 2 ounces of cocaine were found. The informer stated that appellant was distributing heroin to Jackson for delivery. The search revealed the packages in Jackson's house were identical to those seized in this case and received in evidence.

I would affirm both the conviction and the sentence.